# BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

ATTORNEYS AT LAW

NEW YORK • CALIFORNIA • LOUISIANA • ILLINOIS

BENJAMIN GALDSTON
beng@blbglaw.com
(858) 720-3188

February 8, 2018

**VIA ECF & HAND DELIVERY**
The Honorable Henry Pitman
Southern District of New York
Daniel Patrick Moynihan, United States Courthouse
500 Pearl Street, Courtroom 18A
New York, New York 10007-1312

    Re:   *BlackRock Allocation Target Shares: Series S Portfolio, et al.
              v. The Bank of New York Mellon,* No. 14 Civ. 9372 (S.D.N.Y.)

Dear Judge Pitman:

      In accordance with the Court's January 25, 2018 Order (ECF No. 145), we write on behalf of Plaintiffs to explain why (i) the existing 28 BNY Mellon custodians identified in the attached Exhibit 1 (the "Existing Custodians") will not capture core categories of documents relevant to Plaintiffs' claims, (ii) the nine custodians that are the subject of Plaintiffs' January 22, 2018 motion to compel (the "New Custodians") uniquely possess those categories of documents, and (iii) there is minimal, if any, burden on BNY Mellon adding the New Custodians.[1]

      The New Custodians uniquely possess relevant documents that are not within the Existing Custodians' files. Indeed, BNY Mellon inadvertently produced over 15,000 relevant, responsive and **Trust-specific** documents from the New Custodians' files that were not produced from (and would not be found in) the files of Existing Custodians. These and many other important relevant documents can be discovered only from the New Custodians for two reasons: (i) the New Custodians were involved with different Trusts, and different Sellers and Servicers for the Trusts, than the Existing Custodians, and (ii) the New Custodians, unlike the Existing Custodians, were responsible for escalating Seller and Servicer default matters to relevant committees and senior management.

      The Existing Custodians are largely comprised of lower- and mid-level employees responsible for the routine, pre-default administration of the Trusts. As to the non-routine, default matters – which are important to Plaintiffs' claims – the Existing Custodians do not cover all the Trusts at issue nor all of the important Sellers and Servicers. For example, the documents produced thus far demonstrate that the Existing Custodians will not capture default- and bankruptcy-related

---

[1] Capitalized terms not defined in this letter have the same meaning as in Plaintiffs' Complaint.

12481 HIGH BLUFF DRIVE • SUITE 300 • SAN DIEGO • CA 92130-3582
TELEPHONE: 858-793-0070 • www.blbglaw.com • FACSIMILE: 858-793-0323



The Honorable Henry Pitman
February 8, 2018
Page 2

---

materials for at least 12 Trusts. Rather, those documents are in the unique possession of one of the New Custodians.

In addition, the Existing Custodians were not involved in important communications among senior management relating to non-routine, default matters. For example, although BNY Mellon has produced documents that show the Existing Custodians preparing briefing materials for the New Custodians' meetings with BNY Mellon senior management about Corporate Trust's exposure to Countrywide (the largest loan originator by volume/value for the Trusts) during the financial crisis, it did not produce the documents and communications relating to elevating the issue to senior management or subsequent meetings and communications among senior management about the issue. Those documents are in the unique possession of the New Custodians.

Finally, the burden on BNY Mellon is minimal. BNY Mellon has already collected in related actions the ESI of seven of the nine proposed New Custodians. Even more, BNY Mellon has already applied Plaintiffs' search terms to four of those seven custodians' ESI and produced a portion of their responsive documents. There is little burden to produce the remaining responsive documents that hit on Plaintiffs' search terms, and even less to produce the documents already produced in the related actions for the New Custodians. Because the related actions involved at least 27 of the same Trusts as here, BNY Mellon likely applied substantially similar search terms.

Under these circumstances, adding the New Custodians is likely to discover unique relevant information and is proportional to the needs of the case, which involves 249 Trusts with over $15 billion in losses.

## I. The Existing Custodians' Files Omit Core Relevant Information

Searching the files of the 28 Existing Custodians will not capture core categories of relevant documents that likely will be obtained from the New Custodians' files for three reasons.

**The Existing Custodians Do Not Include A Key Default Administrator.** The Default Administration Group is responsible for addressing all matters related to defaults that occurred in RMBS trusts. Because only one Default Administrator was assigned to each Trust, the Default Administrator is in unique possession of default- and bankruptcy-related documents. For example, the Default Administrator sent notices to certificateholders of Events of Default that occurred in the Trusts. The Default Administrator was the sole contact on the notice and therefore likely would be the only one in possession of communications with certificateholders and other stakeholders. Additionally, the Default Administrator signed and filed proofs of claims in bankruptcy proceedings. Consequently, the Default Administrator likely possesses unique documents relating to investigations of breaches of representations and warranties and proof of claim filings.

Here, only two of the 28 Existing Custodians are Default Administrators. Document discovery confirms that these two custodians were not the Default Administrators assigned to many of the Trusts at issue. Furthermore, the remaining 26 Existing Custodians are not reasonably likely to possess the missing default- and bankruptcy-related documents because they were

The Honorable Henry Pitman
February 8, 2018
Page 3

responsible for non-default matters relating to the Trusts.  Therefore, although Plaintiffs are receiving default-related documents for some Trusts, they are not receiving those same relevant documents for a large number of the Trusts at issue.

**The Existing Custodians Do Not Include The Key Trustee Decision-Makers.**  The Existing Custodians largely comprise mid- and lower-level employees.  They do not include the senior executives who ran and were the key BNY Mellon decision makers.  Thus, Plaintiffs have only a portion of all relevant facts.  For example, Countrywide, which originated over 16% of the total loans collateralizing the Trusts, also represented about 50% of BNY Mellon's Corporate Trust business.  After Countrywide's stock fell more than 75% in the summer of 2007, the Existing Custodians briefed Patrick Tadie and Karen Peetz on the Corporate Trust division's Countrywide exposure and risk mitigation efforts.  Mr. Tadie and Ms. Peetz, in turn, reported on these issues to BNY Mellon senior management.  While BNY Mellon has produced certain communications between the Existing Custodians and Mr. Tadie and Ms. Peetz, it has failed to produce any subsequent communications between Mr. Tadie and Ms. Peetz and senior management, which Plaintiffs know to exist from documents and testimony in related actions.  Plaintiffs are deprived of these documents because Mr. Tadie and Ms. Peetz are not Existing Custodians.

Furthermore, the Existing Custodians do not include key members of BNY Mellon's Corporate Trust committees.  For example, the Corporate Trust Business Risk Committee evaluated significant risks to the Corporate Trust division, such as exposure to default and bankrupt Sellers like Countrywide.  Issues discussed in the committees were, in turn, escalated to senior management in and outside of Corporate Trust.  But the Existing Custodians do not include any Corporate Trust Business Risk Committee members, and Plaintiffs are thus deprived of relevant committee minutes, agendas, and presentations that were circulated via email to those members.

**The Existing Custodians Include Only One Document Custody Employee.**  The Document Custody group is responsible for certifying the completeness of the mortgage loan files for the loans in the Trusts and reporting on missing or incomplete documents that, if not cured, subject the loan to be repurchased.  The Document Custody group would therefore uniquely possess initial and final certifications and exception reports for the Trusts, and communications about the Trustee's efforts to remedy uncured exceptions or putback loans with missing or incomplete documents.  Although BNY Mellon has produced these documents for a handful of Trusts from the files of one Existing Custodian, they are missing for substantially all of the Trusts.

II.     **The New Custodians Uniquely Possess Core Categories Of Documents**

**Martin Feig Is A Default Administrator Who Uniquely Possesses Default-Related Documents For The Trusts.**  As a Managing Director of the Default Administration Group, Mr. Feig worked with certificateholders, bankrupt Sellers and Servicers, and other stakeholders to maximize the Trusts' recovery in default and bankruptcy situations.  Mr. Feig was identified in BNY Mellon's initial disclosures as an employee that is likely to have discoverable information.

The Honorable Henry Pitman
February 8, 2018
Page 4

Mr. Feig was the sole Default Administrator for at least 12 Trusts and is likely to possess unique default- and bankruptcy-related documents not found within the files of the Existing Custodians.  This has been confirmed by BNY Mellon's production of 497 relevant, responsive and **Trust-specific** documents that were uniquely in Mr. Feig's possession.  For example, a handful of Notices of Events of Default for the Trusts were produced from Mr. Feig's files and list Mr. Feig as the sole contact.  As the sole contact, Mr. Feig is likely to have additional communications with certificateholders and other stakeholders about the Events of Defaults that have not yet been produced.

Furthermore, Mr. Feig was the sole Default Administrator assigned to Countrywide RMBS.  Although Countrywide was the Seller for loans in 40 Trusts at issue, BNY Mellon's production is missing both internal and external communications with Countrywide concerning defaults that have occurred in substantially all of those Trusts.

**Relationship Managers Bill Herrmann And Michael Cerchio Uniquely Possess Documents For Trust Sellers.**  Mr. Herrmann and Mr. Cerchio were Senior Relationship Managers who had significant responsibility for BNY Mellon's efforts to putback breaching loans to Sellers.  Both Mr. Herrmann and Mr. Cerchio were identified in BNY Mellon's initial disclosures as employees that are likely to have discoverable information.

None of the Existing Custodians were Senior Relationship Managers for the same Sellers as Mr. Herrmann and Mr. Cerchio and therefore would not likely maintain the same documents.  This is confirmed by BNY Mellon's production of over 14,000 relevant, responsive and **Trust-specific** documents that were uniquely in their possession, including:

- Documents relating to Mr. Herrmann's and Mr. Cerchio's efforts to putback tens of thousands of Countrywide loans in BNY Mellon's "Document Cure Project."

- Communications with Freddie Mac and Fannie Mae (and other certificateholders) concerning Trust loan file requests, results of forensic reviews, and tolling agreements.

- Communications with Ambac and MBIA (and other monoline insurers) about their refusal to pay insurance claims based on widespread and pervasive misrepresentations across the Trusts.

- Documents concerning the financial condition of Sellers for which they were the Relationship Managers, such as credit risk reviews, monthly ratings, on-site audits and internal reporting on earnings.

- Communications about the "watch" status of Servicers for Trusts to which BNY Mellon was the back-up Servicer.

**The New Custodians Include The Key Decision-Makers In Corporate Trust.**  Patrick Tadie (Executive Vice President), Karen Peetz (President), Harold Fudali (Managing Director),

The Honorable Henry Pitman
February 8, 2018
Page 5

_____

Scott Posner (pre-2010 Head of Corporate Trust) and Eric Kamback (post-2010 Head of Corporate Trust) ran BNY Mellon's Corporate Trust division throughout the relevant time. These custodians were involved in communications concerning the Trusts, Sellers and Servicers in which the Existing Custodians would not have participated, including:

- Minutes, notes, agendas, and presentations relating to the Corporate Trust Business Risk Committee and Investment Committee.

- Strategy and efforts to mitigate risk associated with BNY Mellon's exposure to Countrywide and other financially distressed Sellers and Servicers.

- Decisions to pursue or not pursue litigation against Sellers that pervasively breached representations and warranties for the loans in the Trusts.

- BNY Mellon's investments in RMBS trusts, including its purchase, sale, and any short or long positions held in the Trusts at issue.

- BNY Mellon's efforts to putback loans held on its own balance sheet to Sellers.

- The multi-million-dollar monthly profit Corporate Trust earned from serving as Trustee, including the $2 million monthly profit from Countrywide alone.

- The acquisition of its competitor's RMBS trustee business, including BNY Mellon's 2006 $3.1 billion acquisition of J.P. Morgan's corporate trust business.

- BNY Mellon's non-trustee services provided to Sellers, such as the $6 billion five-year credit agreement entered with Countrywide to fund its loan origination.

- Communications with employees outside the Corporate Trust division concerning the Trusts, Sellers and Servicers.

**Ernest Ulate Will Uniquely Possesses Trust Exception Reports.** As a Managing Director in BNY Mellon's Document Custody group, Mr. Ulate likely possesses initial and final certifications and exception reports for the Trusts, and communications about the Trustee's efforts to putback loans with missing or incomplete documents not available from the Existing Custodians. Indeed, Mr. Ulate was identified as likely to have discoverable information in initial disclosures. The 740 **Trust-specific** documents BNY Mellon already produced for Mr. Ulate confirm that he uniquely possesses document-custody related documents for many of the Trusts.

### III. <u>Any Burden Is Proportional And Outwieghed By The Benefit</u>

There is minimal, if any, burden on BNY Mellon in producing documents for the New Custodians for three reasons.

5

The Honorable Henry Pitman
February 8, 2018
Page 6

**First**, BNY Mellon has already collected the ESI for seven of the nine New Custodians for the relevant period across 8 related cases that involve at least 27 of the same Trusts as this case (all except Ms. Peetz and Mr. Kamback). These cases allege the same underlying conduct and failings by BNY Mellon as trustee for RMBS securitizations of the same vintage during the same time period based on the same pervasive seller and servicer misconduct. *See, e.g.*, *Phx. Light SF Ltd, et al. v. The Bank of New York Mellon*, 14 Civ. 10104 (S.D.N.Y.) (7 of the same Trusts); *Commerzbank AG v. Bank of New York Mellon*, 15 Civ. 10029 (S.D.N.Y.) (9 of the same Trusts); *Royal Park Invs. SA/NV v. The Bank of New York Mellon*, 14 Civ. 6502 (S.D.N.Y.) (4 of the same Trusts); *The W. and S. Life Ins. Co. v. The Bank of New York Mellon*, No. A1302490 (Court of Common Pleas Ohio, Hamilton County) (4 of the same Trusts).

**Second**, of those seven New Custodians, BNY Mellon has already run Plaintiffs' search terms against the ESI of four of them (Mr. Feig, Mr. Cerchio, Mr. Herrmann, and Mr. Ulate). BNY Mellon has also completed its review of the documents that hit on Plaintiffs' search terms and produced a portion of the responsive documents. The additional burden of producing the remaining responsive documents is minimal.

**Third**, BNY Mellon has already produced documents for seven of the nine New Custodians in other cases involving 27 of the same Trusts. At a minimum, there is no burden for BNY Mellon to produce in this case the documents that it produced in the other cases. Because 27 Trusts overlap, the search terms applied in those cases are likely substantially similar to the ones applied here. Although Plaintiffs requested that BNY Mellon provide those search terms so that they could advise the Court on the similarities, BNY Mellon refused.

### IV.     Conclusion

Ordering BNY Mellon to produce documents for the New Custodians will elicit important, relevant information that will not be found in the files of the Existing Custodians and is proportional to the needs of the case, which involves 249 Trusts and over $15 billion in losses on the Trusts' underlying collateral. Accordingly, Plaintiffs respectfully request that the Court compel BNY Mellon to search the custodial files of the New Custodians.

We thank the Court for its attention to this matter.

                                             Respectfully submitted,

                                             */s/ Benjamin Galdston*

                                             Benjamin Galdston

Cc:  Counsel of Record (via email)