UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------X

BLACKROCK ALLOCATION TARGET          :
SHARES:   SERIES S PORTFOLIO,
et al.,                              :

            Plaintiffs,              :        14 Civ. 9372 (GBD)(HBP)

    -against-                        :        OPINION
                                              AND ORDER
THE BANK OF NEW YORK MELLON,         :
et al.,
                                     :

            Defendants.              :

---------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/14/18

            PITMAN, United States Magistrate Judge:


I.   Introduction


        This is an action brought by and on behalf of

certificateholders in 238 residential-mortgage-backed securities

("RMBS") trusts (collectively, the "Covered Trusts") against the

Covered Trusts' common trustee, The Bank of New York Mellon

("BNYM").[1]  Plaintiffs seek an Order compelling defendants to

search the electronically stored information ("ESI") and hard-

---

[1]Each of the Covered Trusts are also nominal defendants in
this action.  See Blackrock Allocation Target Shares:  Series S
Portfolio v. The Bank of N.Y. Mellon, 180 F. Supp. 3d 246
(S.D.N.Y. 2016) (Daniels, D.J.).  Originally, the Covered Trusts
consisted of 249 RMBS trusts, but plaintiffs stipulated to the
dismissal of 11 RMBS trusts on April 30, 2018 (Order of the
Honorable George B. Daniels, United States District Judge, dated
Apr. 30, 2018 (Docket Item ("D.I.") 157) at 2).

copy documents of nine additional custodians -- William Hermann, Michael Cerchio, Martin Feig, Ernest Ulate, Harold Fudali, Patrick Tadie, Karen Peetz, Scott Posner and Eric Kamback (collectively, the "Proposed Custodians") -- in addition to the 28 individuals BNYM has already designated as custodians (the "Existing Custodians"). For the foregoing reasons, plaintiffs' request is granted in part and denied in part.

II. Facts

The factual and procedural background of this action is set forth in two prior Opinions of the Honorable George B. Daniels, United States District Judge. See Blackrock Allocation Target Shares: Series S Portfolio v. The Bank of N.Y. Mellon, 14 Civ. 9372 (GBD), 2016 WL 5812627 at *1 (S.D.N.Y. Oct. 4, 2016); Blackrock Allocation Target Shares: Series S Portfolio v. The Bank of N.Y. Mellon, supra, 180 F. Supp. 3d at 246. The reader's familiarity with these Opinions is presumed. I recite the facts here only to the extent they are pertinent to the legal analysis of the dispute before me.

Plaintiffs are certificateholders of the Covered Trusts (Complaint, dated Nov. 24, 2014 (D.I. 1) ("Compl.") ¶ 1). In his Opinion dated March 25, 2016, Judge Daniels explained how the Covered Trusts operated:

The [Covered] Trusts' assets are residential mortgage loans. (See Compl. ¶ 2). Investment banks acting as "Sponsors" and "Depositors" (collectively known as "Sellers") first acquired these loans generated by mortgage loan originators. (See Compl. ¶¶ 2, 197-99). The Sellers then pooled the loans and conveyed them into the [Covered] Trusts. (See Compl. ¶¶ 2, 197-99). The Sponsors select "Servicers", who collect payments on the loans from the underlying borrowers and send the funds to the trustees. (Compl. [¶¶] 2, 200). The trustees make payment to [the Covered] Trusts' Certificateholders. (Compl. ¶ 200). In this manner, the principal and interest payments on the underlying residential mortgage loans are "passed through" to the [Covered] Trusts' Certificateholders. (Compl. ¶ 2).

The Sellers provide contractual representations and warranties to the [Covered] Trusts attesting to the completeness of the mortgage loan files and credit quality of the underlying loans. (Compl. ¶¶ 3, 205). The Sellers contract to cure, substitute, or repurchase mortgages that materially breach these representations and warranties (Compl. [¶¶] 206-09). The Servicers also covenant to service loans in accordance with customary and usual standards of practice and prudent institutional mortgage lenders servicing similar loans. (Compl. ¶ 229).

Blackrock Allocation Target Shares: Series S Portfolio v. The Bank of N.Y. Mellon, supra, 180 F. Supp. 3d at 252-53.

The relationship between BNYM and plaintiffs is controlled by "Governing Agreements"; each RMBS trust has its own Governing Agreement, but "[t]he Complaint alleges that the terms of the Governing Agreements that are relevant to this action are substantially similar and impose substantially the same duties and obligations on BNYM. (See Compl. [¶] 203)." Blackrock Allocation Target Shares: Series S Portfolio v. The Bank of N.Y.

Mellon, supra, 180 F. Supp. 3d at 252-53. Under the Governing Agreements, among other things, BNYM has a duty to: (1) "give notice to the Seller and other parties upon the discovery of the [Seller's] breach of warranties that materially and adversely affects the value and interests of the Covered Trusts"; (2) "enforce the Seller's duty to repurchase the breaching loan if the Seller refuses or fails to cure the breach"; (3) "notify a responsible Servicer upon discovery of the Servicer's failure to observe or perform in any material respect any covenant or agreement" and (4) exercise a duty of care upon discovery of an event of default or a breach of warranty or representation. Blackrock Allocation Target Shares: Series S Portfolio v. The Bank of N.Y. Mellon, supra, 180 F. Supp. 3d at 253.

Plaintiffs commenced this derivative action on November 24, 2014, claiming that BNYM engaged in pervasive violations of its duties as trustee, resulting in an alleged loss of approximately $15 billion to plaintiffs' investments in the Covered Trusts (see Letter of Benjamin Gladston, Esq., to the undersigned, dated Feb. 8, 2018 (D.I. 149) ("Second Gladston Letter") at 2). Plaintiffs' remaining claims are for violation of the Trust Indenture Act of 1939 and breach of contract, premised on three specifications: (1) BNYM's failure to provide written notice of breaches of the Sellers' representations and warranties

4

upon BNYM's discovery of those breaches; (2) BNYM's failure to enforce the Sellers' contractual obligation to cure or repurchase defective loans and (3) BNYM's failure to provide Certificateholders with "Notice of Events of Default" and to act as a prudent person would once it had discovered the events of default.[2]  Blackrock Allocation Target Shares:  Series S Portfolio v. The Bank of N.Y. Mellon, supra, 180 F. Supp. 3d at 259.

At the outset of litigation, BNYM voluntarily agreed to search the custodial files and emails of 13 individuals for relevant hard-copy documents and ESI using plaintiffs' search terms.  BNYM later agreed to search the files of 15 additional custodians during the course of the parties' meet-and-confers,[3] bringing the total number of Existing Custodians to 28.  Accord-

_____

[2]Judge Daniels dismissed plaintiffs' claims of negligence and breach of fiduciary duty in his March 25, 2016 Opinion and Order.  See Blackrock Allocation Target Shares:  Series S Portfolio v. The Bank of N.Y. Mellon, supra, 180 F. Supp. 3d at 246.

[3]Although BNYM agreed to 15 additional custodians, it did not agree to run all of plaintiffs' search terms across those custodians' files.  Specifically, BNYM refused to use terms that it deemed "non-trust-specific" on the ground that it would result in an unreasonable volume of search results (Letter of Charles S. Korschun, Esq., to the undersigned, dated Jan. 24, 2018 (D.I. 150) ("Second Korschun Letter") at 1-2).  Plaintiffs and BNYM are continuing to negotiate mutually agreeable search parameters, including search terms, for these 15 custodians.  Because there is no indication in the correspondence that there was a breakdown in those negotiations and there is no dispute concerning the search terms before me, I shall not address the search terms.

ing to BNYM, the Existing Custodians were drawn from BNYM current and former employees who "participate[d] in and/or overs[aw]" BNYM's trustee duties with respect to the Covered Trusts for the relevant time period (Second Korschun Letter at 1).[4] BNYM has also committed to searching its "shared drive" for all documents relating to the Covered Trusts.[5] BNYM has collected ESI from the Existing Custodians and the shared drive, and is producing that material to plaintiffs on a rolling basis. According to plaintiffs, BNYM has produced less than 85,000 documents to date (Letter of Benjamin Gladston, Esq., to the undersigned, dated Jan. 22, 2018 ("First Gladston Letter") at 4, annexed as Ex. 1 to the Letter of Benjamin Gladston, Esq., to the undersigned, dated Jan. 22, 2018 (D.I. 143) ("Parent Gladston Letter")). BNYM reports that it is still in the process of reviewing the voluminous amounts of data and that additional productions are forth-

---

[4]The parties agree that the relevant time period for purposes of discovery is January 1, 2004 through July 18, 2014 (Second Korschun Letter at 2 n.3).

[5]The shared drive is a centrally located file in which BNYM employees can save documents so that they are accessible to other employees who have clearance to view those documents; documents saved to the shared drive are not located in the file of any particular Existing Custodian, although duplicates of such documents may be. According to BNYM, each Covered Trust has a "folder" in the shared drive, and those folders contain "core", trust-specific documents circulated by email or by hard-copy documents that were scanned and saved to the shared drive (Second Korschun Letter at 10-11).

coming; however, it did not provide any information that would enable me to quantify the portion of the entire production that is outstanding.

On December 6, 2017, plaintiffs requested a pre-motion conference with Judge Daniels in anticipation of their seeking to compel BNYM to search the files of 96 additional individuals who plaintiffs identified as potentially maintaining relevant documents (Letter of Timothy A. DeLange, Esq., to Judge Daniels, dated Dec. 6, 2017 (D.I. 138) at 6-7). Judge Daniels held a pre-motion conference on December 12, 2017, and directed the parties to meet-and-confer in an attempt to reach a compromise concerning the additional custodians plaintiffs sought and other discovery issues; Judge Daniels also referred the matter to me for general pre-trial purposes (Transcript of Pre-Motion Conference held Dec. 12, 2018, dated Dec. 20, 2017 (D.I. 141); Order of Reference of Judge Daniels, dated Dec. 13, 2017 (D.I. 140)).

In advance of a January 25, 2018 status conference scheduled before me, plaintiffs submitted a letter, dated January 22, 2018, advising me that plaintiffs had reduced their request for additional custodians to only the nine Proposed Custodians, but that BNYM still refused to include those individuals' files unless plaintiffs agreed to drop nine of the Existing Custodians, and, therefore, the parties had reached an impasse (First

Gladston Letter).[6]  At the January 25, 2018 status conference,

the parties presented arguments in support of their respective

positions.  I concluded that I would need more information

concerning the incremental benefit of searching the files of the

Proposed Custodians in order to make an informed decision, and I

requested supplemental briefing on this issue.  I directed that

BNYM's submission identify the Existing Custodians, explain what

role each played with respect to the administration of the

Covered Trusts and describe the categories of relevant documents

that each possess.  I also directed that plaintiffs provide a

list of the Proposed Custodians and identify the types of docu-

ments they believed exist solely in the files of the Proposed

Custodians (Transcript of Status Conference held Jan. 25, 2018,

dated Jan. 29, 2018 (D.I. 147) at 45-46; see Order of the under-

signed, dated Jan. 25, 2018 (D.I. 145)).

On February 8, 2018, the parties simultaneously submit-

ted letter briefs (see Second Korschun Letter; Second Gladston

Letter).  BNYM's submission explained that each of the Existing

Custodians worked in one of three BNYM departments that performed

---

[6]BNYM also submitted a letter, dated January 24, 2018,
setting forth the practical and legal grounds on which it opposed
plaintiffs' request to search the files and emails of the
Proposed Custodians (Letter of Charles S. Korschun, Esq., to the
undersigned, dated Jan. 24, 2018 (D.I. 144) ("First Korschun
Letter")).

trustee duties in connection with the Covered Trusts:  the
Corporate Trust Group ("CT"), the Default Administration Group
("DAG") or the Default Custody Group ("DCG") (Second Korschun
Letter at 2).  BNYM's activities as trustee are principally
carried out by CT and its Mortgage-Backed Securities sub-group
("MBS") (Second Korschun Letter at 2).  MBS is divided into
administration teams ("Trust Teams") that are responsible for
"the majority of trustee services" with respect to the Covered
Trusts (Second Korschun Letter at 2).  Each Trust Team is as-
signed to "shelves" of Covered Trusts.  A Trust Team consists of
at least one of the following types of employees, listed in order
of seniority:  (1) a Team Leader ("TL"); (2) a Client Service
Manager ("CSM") and (3) a Trust Administrator ("TA") (Second
Korschun Letter at 2).  BNYM stated that it "focused" on Trust
Team members in its selection of custodians for this action -- 24
of the 28 Existing Custodians are Trust Team members (Second
Korschun Letter at 3, 5, 7).  BNYM asserts that, in the aggre-
gate, these 24 Existing Custodians were assigned to administer
and manage all of the Covered Trusts for the entire relevant time
period (see List of Relevant Trust Team Members, dated Feb. 8,
2018 ("List of Trust Team Members"), annexed as Ex. A to Second
Korschun Letter).  They consist of 10 TLs, 12 CSMs and 2 TAs;
BNYM reports that in designating Trust Team members as custodians

it first selected all TLs who were assigned to the Covered Trusts during the relevant time period and, where no TL for a certain Covered Trust or period of time could be identified, BNYM selected the next most senior identifiable Trust Team member -- the CSM in most cases -- who worked on the Covered Trust at issue (Second Korschun Letter at 3, 5, 7).

Despite the difference in roles and responsibilities of the two positions, TAs and CSMs both possess the same categories of documents, including, but not limited to:

- Correspondence between BNYM and Certificateholders, deal parties, insurers, or other sources identifying or discussing purported breaches of representations and warranties with respect to the loans in the Covered Trusts;

- Correspondence between BNYM and the Sellers, originators or other warrantors, regarding representations and warranties with respect to the loans included in the trusts at issue, including requests that mortgage loans be cured, substituted, or repurchased as a result of purported representation and warranty breaches;

- Correspondence between BNYM and any other party alleging, identifying or discussing potential violations of servicing obligations with respect to the mortgage loans in the Covered Trusts;

- Correspondence to or from BNYM regarding servicing standards with respect to mortgage loans in the Covered Trusts;

- Correspondence between BNYM and any other party purportedly identifying or discussing the potential occurrence of an event of default and

- Internal reporting regarding updates concerning administration of trusts assigned to a CSM or projects concerning trusts assigned to a CSM.

(Second Korschun Letter at 4, 6). TAs possess fewer categories of documents, but likely shared some documents with CSMs who worked on the same Covered Trusts, such as correspondence to a CSM or on which a CSM was copied, correspondence received from investors or insurers regarding allegations of breaches of representations and warranties, but it does not appear that they are likely to possess direct correspondence from the Sellers or Servicers (Second Korschun Letter at 8).

In addition to the 24 Trust Team members, BNYM also included as a custodian Melissa Adelson, a Managing Director ("MD") in MBS (Second Korschun Letter at 8). Although Adelson was not assigned to any Covered Trust in particular, she "had oversight of all [Trust] [T]eams within MBS" and, therefore, her personal files likely include "documents of relative importance discussed within the department and . . . with other senior managers," as well as "certain reports and documents shared with DAG" (Second Korschun Letter at 8).

As noted above, BNYM selected several other employees of DAG and DCG as custodians. These two collateral BNYM groups support CT in its administration of the Covered Trusts. DAG is responsible for, among other things, managing and overseeing

default- and bankruptcy-related issues affecting the Covered
Trusts (Second Korschun Letter at 9). For example, DAG "worked
with certificateholders, bankrupt Sellers and Servicers[] and
other stakeholders to maximize the [Covered] Trusts' recovery in
default and bankruptcy situations" (Second Gladston Letter at 3).
BNYM selected two MDs in DAG, Loretta Lundberg and Gerald
Facendola, as custodians (Second Korschun Letter at 9). BNYM
represents that Lundberg and Facendola likely possess the follow-
ing categories of documents, to the extent such documents exist:
(1) "reports detailing the status of [Covered Trusts] in bank-
ruptcy, default or guarded status"; (2) correspondence in which
"potential activity raising questions under a [Governing Agree-
ment] is discussed" and (3) correspondence about alleged breaches
or potential litigation with respect to Covered Trusts (Second
Gladston Letter at 9).

DCG is responsible for "receiving, hold[ing] and
distribut[ing] documents" that relate to the loans that make up
the collateral pool backing the Covered Trusts (Second Korschun
Letter at 9). BNYM selected Terry Chavez, Head of DCG during the
relevant time period, as a custodian because he would have
received and reviewed important Covered Trust-related documents,
including "reports that identify missing or incomplete loan
documentation [which] evidence [BNYM]'s discovery of breaches of

12

representations and warranties" of the Governing Agreements ("Exception Reports") (First Gladston Letter at 4).

BNYM also collected responsive documents saved to BNYM's shared drives. According to BNYM, it searched and collected documents from the shared drive folders specific to all of the Covered Trusts, including underlying deal documents such as Exception Reports (Second Korschun Letter at 10). BNYM states that the shared drives are likely to have some overlap with the emails and documents collected from the 24 Trust Team members (Second Korschun Letter at 10-11).

Plaintiffs' submission identifies the names and roles of the Proposed Custodians, as well as the types of documents they are believed to possess. Plaintiffs explain that their belief is informed by limited, publicly available documentation, including documents produced in connection with other related actions, and 6,456 trust-specific documents that they allege are held only in the custodial files of Hermann, Cerchio, Feig and Ulate, which BNYM collected and inadvertently produced (Second Gladston Letter at 1).[7]

---

[7]Plaintiffs initially represented that BNYM had inadvertently produced 15,000 relevant and unique documents; however, in a Joint Letter, dated February 14, 2018, the parties issued a correction to this statement and advised that only 6,456 of those documents were uniquely possessed by Proposed Custodians
(continued...)

13

Plaintiffs assert that CSMs Hermann and Cerchio uniquely possess relevant information, including, but not limited to (1) documents and correspondence relating to BNYM's endeavors to enforce certain Sellers' (particularly Countrywide's) obligations to repurchase and "cure" loans; (2) documents and correspondence relating to the financial condition of Sellers for whom Hermann and Cerchio were solely responsible and (3) correspondence with insurers who refused to pay claims based on "widespread and pervasive misrepresentations across [the Covered] Trusts" (Second Gladston Letter at 4). Plaintiffs provide a handful of exemplar documents from the inadvertent production, which they claim reside exclusively in the files of Hermann and Cerchio, including a communication from Fannie Mae to Hermann expressing "increasing[] concern[] about the integrity of loans underlying" certain RMBS trusts (Letter of Fannie Mae to William Hermann, dated Jan. 15, 2009, at 3, annexed as Ex. 7 to Parent Gladston Letter).

Plaintiffs also list Feig, an MD in DAG, as a Proposed Custodian. Plaintiffs claim that Feig was the sole DAG MD responsible for default- and bankruptcy-related issues with

---

[7](...continued)
(Joint Letter of Jennifer M. Rosa, Esq., and Benjamin Gladston, Esq., to the undersigned, dated Feb. 14, 2018 (D.I. 151)("Joint Letter")).

respect to at least 12 Covered Trusts and, thus, likely possesses unique and relevant documents that Lundberg and Facendola do not, such as communications to Certificateholders regarding events of default (Second Gladston Letter at 4). As an example, plaintiffs provide what appears to be a "DAG Report" that identifies numerous events of default involving RMBS trusts, which plaintiffs claim resides exclusively in Feig's files (DAG Report, dated May 9, 2011, annexed as Ex. 4 to Parent Gladston Letter). Plaintiffs also assert that Feig was solely responsible for default- and bankruptcy-related issues with respect to loans originated by Countrywide -- a seller that, according to plaintiffs, originated the loans that collateralized approximately 40 Covered Trusts. Thus, according to plaintiffs, Feig likely possesses both "internal and external communications with Countrywide concerning defaults that . . . occurred" in those Covered Trusts (Second Gladston Letter at 4).[8] In addition, plaintiffs point to Lundberg's testimony in a related action that Feig "was the DAG member [who] handled most the RMBS matters" to support their contention that Feig uniquely possessed relevant documents (Western & Southern Life Ins. Co.'s Opposition to BNYM's Motion

---

[8]Plaintiffs understand those communications to exist based on incomplete documentation produced by BNYM (Second Gladston Letter at 2).

for Summary Judgment in The Western & Southern Life Ins. Co. v. The Bank of N.Y. Mellon, Case No. A1302490, dated May 13, 2016, at 12 n.43, annexed as Ex. 3 to Parent Gladston Letter).

Plaintiffs also propose adding Ulate, an MD of DCG, as a custodian.  Plaintiffs assert that BNYM has not produced Exception Reports with respect to over 200 Covered Trusts and that Ulate was "often sent" Exception Reports (First Gladston Letter at 4).  Plaintiffs note that approximately 740 trust-specific documents inadvertently produced by BNYM are in Ulate's exclusive possession (Second Gladston Letter at 5).

Finally, plaintiffs propose designating senior person-nel in CT, including the Head of the Structured Finance subgroup (Fudali), two Executive Vice Presidents (Tadie and Peetz) and the former and current heads of CT (Posner and Kamback, respec-tively)[9] as custodians.  Plaintiffs acknowledge that these five Proposed Custodians were not tasked with day-to-day administra-tion of the Covered Trusts, but nevertheless assert that these Proposed Custodians were "key decision-makers" in light of their seniority in CT and their membership on the CT Business Risk Committee, which "evaluated significant risks to [CT], such as exposure to default and bankrupt Sellers[,]" (Second Korschun

---

[9]Posner was the Head of CT from 2007 through 2010; Kamback succeeded him (First Gladston Letter at 4).

Letter at 3). Plaintiffs assert these custodians possess documents and correspondence relating to BNYM's risk-mitigation efforts and strategies with respect to "financially distressed" Sellers, BNYM's efforts to cure loans and BNYM's decision to pursue litigation against the Sellers and Servicers (Second Gladston Letter at 5).

Plaintiffs represent, and BNYM does not dispute, that BNYM has run plaintiffs' search terms across, and collected the results from, the custodial files of Hermann, Cerchio, Feig and Ulate, and inadvertently produced a portion of their documents.[10] BNYM has also previously collected ESI from Fudali, Tadie and Peetz in connection with eight related cases involving 27 Covered

---

[10]At the January 25, 2018 status conference, BNYM stated that it had collected data from Hermann, Cerchio, Feig and Ulate in connection with other actions. However, plaintiffs' submission expressly states that BNYM ran plaintiffs' search terms across Hermann, Cerchio, Feig and Ulate's personal files and collected the results (Second Gladston Letter at 6). BNYM's submission did not address its collection efforts for these Proposed Custodians in connection with this action nor did it address the inadvertent production. In the Joint Letter, BNYM corrected two inaccuracies in plaintiffs' submission: (1) that BNYM inadvertently produced 6,456, not 15,000, unique relevant documents that would not have been captured in the approximately 85,000 documents already produced and (2) that BNYM was still reviewing ESI, despite plaintiffs' statement otherwise (Joint Letter at 1). However, in the Joint Letter, BNYM did not use the opportunity to dispute plaintiffs' assertion that it had collected from Hermann, Cerchio, Feig and Ulate's files using plaintiffs' search terms (Joint Letter). Therefore, it appears that BNYM did use plaintiffs' search terms to search the files of Hermann, Cerchio, Feig and Ulate.

Trusts for the relevant time period (Second Gladston Letter at 4-5).

III. <u>Analysis</u>

    A. <u>Legal Standards</u>

        "Parties are entitled to discovery of documents in the 'possession, custody or control' of other parties, Fed.R.Civ.P. 34(a)(1), so long as they are 'relevant to any party's claim or defense,' Fed.R.Civ.P.26(b)." <u>Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.</u>, 297 F.R.D. 99, 102 (S.D.N.Y. 2013) (Francis, M.J.). "Although not unlimited, relevance for purposes of discovery is an extremely broad concept." <u>American Fed'n of Musicians of the United States & Canada v. Sony Music Entm't, Inc.</u>, 15 Civ. 5249 (GBD)(BCM), 2016 WL 2609307 at *3 (S.D.N.Y. Apr. 29, 2016) (Moses, M.J.), <u>quoting</u> <u>Condit v. Dunne</u>, 225 F.R.D. 100, 105 (S.D.N.Y. 2004) (Leisure, D.J.); <u>accord</u> <u>Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.</u>, <u>supra</u>, 297 F.R.D. at 102. "Relevant information need not be admissible at trial," <u>Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.</u>, <u>supra</u>, 297 F.R.D. at 102, <u>quoting</u> Fed.R.Civ.P. 26(b)(1), rather, "'[r]elevance' has been broadly interpreted to include 'any matter that bears on, or that reasonably could lead to other

matter that could bear on any issue that is or may be in the case.[']" <u>Gilani v. Hewlett Packard Co.</u>, 15 Civ. 5609 (NSR), 2017 WL 4236564 at *1 (S.D.N.Y. Sept. 22, 2017) (Román, D.J.), <u>quoting</u> <u>Oppenheimer Fund, Inc. v. Sanders</u>, 437 U.S. 340, 351 (1978). "The burden of demonstrating relevance is on the party seeking discovery." <u>See</u> <u>Refco Grp. Ltd., LLC v. Cantor Fitzgerald, L.P.</u>, 13 Civ. 1654 (RA)(HBP), 2014 WL 5420225 at *4 (S.D.N.Y. Oct. 24, 2014) (Pitman, M.J.) (internal quotations omitted), <u>quoting</u> <u>US Bank Nat'l Ass'n v. PHL Variable Ins. Co.</u>, 12 Civ. 6811 (CM)(JCF), 2012 WL 5395249 at *3 (S.D.N.Y. Nov. 5, 2012) (Francis, M.J.).

"'Once relevance has been shown, it is up to the responding party to justify curtailing discovery.'" <u>Fort Worth Employees Ret. Fund v. J.P. Morgan Chase & Co.</u>, <u>supra</u>, 297 F.R.D. at 102, <u>quoting</u> <u>Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.</u>, 284 F.R.D. 132, 135 (S.D.N.Y. 2012) (Cott, M.J.).

Even when the requested documents are relevant, Federal Rule of Civil Procedure 26(b)(1) and (2) provide courts with "'significant flexibility and discretion to assess the circumstances of the case and limit discovery accordingly to ensure that the scope and duration of discovery is reasonably proportional to the value of the requested information, the needs of the case and the parties' resources.'" <u>In re Morgan Stanley</u>

Mortg. Pass-Through Certificates Litig., 09 Civ. 2137 (LTS)(SN),
2013 WL 4838796 at *1 (S.D.N.Y. Sept. 11, 2013) (Netburn, M.J.),
quoting The Sedona Conference, The Sedona Conference Commentary
on Proportionality in Electronic Discovery, 11 Sedona Conf. J.
289, 294 (2010). Courts must "limit discovery if the request is
'unreasonably duplicative,' the requesting party has had 'ample
opportunity to obtain the information by discovery,' or the
'burden or expense of the proposed discovery outweighs its likely
benefit' considering the needs of the case and the importance of
the documents." Fort Worth Employees' Ret. Fund v. J.P. Morgan
Chase & Co., supra, 297 F.R.D. at 102, quoting Fed.R.Civ.P.
26(b)(2)(C); accord Chen-Oster v. Goldman, Sachs & Co., 285
F.R.D. 294, 303 (S.D.N.Y. 2012) (Francis, M.J.) ("A party may . .
. resist discovery of non-computerized documents or of ESI that
is reasonably accessible on the ground that the discovery sought
is disproportionate."). "Proportionality and relevance are
'conjoined' concepts; the greater the relevance of the informa-
tion in issue, the less likely its discovery will be found to be
disproportionate." Vaigasi v. Solow Mgmt. Corp., 11 Civ. 5088
(RMB)(HBP), 2016 WL 616386 at *14 (S.D.N.Y. Feb. 16, 2017)
(Pitman, M.J.) (citation omitted).

Discovery disputes concerning the collection, review
and production of ESI "present[] special challenges" that stan-

dard discovery disputes do not, <u>Winfield v. City of New York</u>, 15
Civ. 5236 (LTS)(KHP), 2017 WL 5664852 at *7 (S.D.N.Y. Nov. 27,
2017) (Parker, M.J.), <u>quoting</u> <u>William A. Gross Const. Assocs.,</u>
<u>Inc. v. American Mfrs. Mut. Ins. Co.</u>, 256 F.R.D. 134, 136
(S.D.N.Y. 2009) (Peck, M.J.), including the substantial likeli-
hood that the data possessed by the responding party is volumi-
nous, stored in multiple formats and is duplicative across
custodians.  Accordingly, judges in this District have instructed
that "the standard [in ESI discovery] is not perfection, . . .,
but whether the search is reasonable and proportional." <u>Hyles v.</u>
<u>New York City</u>, 10 Civ. 3119 (ATF)(AJP), 2016 WL 4077114 at *3
(S.D.N.Y. Aug. 1, 2016) (Peck, M.J.); <u>accord</u> <u>Winfield v. City of</u>
<u>New York</u>, <u>supra</u>, 2017 WL 5664852 at *11 ("In any ESI review, 'the
Federal Rules of Civil Procedure do not require perfection.'"),
<u>quoting</u> <u>Moore v. Publicis Groupe</u>, 287 F.R.D. 182, 192 (S.D.N.Y.
2012) (Peck, M.J.); <u>Pension Comm. of the Univ. of Montreal</u>
<u>Pension Plan v. Banc of Am. Secs., LLC</u>, 685 F. Supp. 2d 456, 461
(S.D.N.Y. 2010) (Scheindlin, D.J.) ("Courts cannot and do not
expect that any party can meet a standard of perfection [in ESI
discovery]."). Thus, a party requesting discovery may not be
entitled, "under the rules of proportionality, to every single
[relevant] document." <u>In re Morgan Stanley Mortg. Pass-Through</u>
<u>Certificates Litig.</u>, <u>supra</u>, 2013 WL 4838796 at *3.

B. Application of the
   Foregoing Principles

     1. Proposed Custodians: Hermann,
   Cerchio, Feig and Ulate

BNYM does not dispute that Hermann, Cerchio, Feig and
Ulate possess relevant documents. Rather, BNYM argues that
plaintiffs have failed to make a "particularized showing" that
these Proposed Custodians "will be the exclusive custodians of
relevant information" and, thus, under the rules of proportional-
ity, plaintiffs are not entitled to their ESI (First Korschun
Letter at 6 n.12, quoting In re Morgan Stanley Mortg. Pass-
Through Certificates Litig., supra, 2013 WL 4838796 at *2 (empha-
sis added)). BNYM asserts that their custodial files will be
duplicative of the documents already collected from the Existing
Custodians and the shared drive.

With respect to Hermann and Cerchio, BNYM argues that
it selected the 24 Trust Team members as Existing Custodians
because, in the aggregate, they worked on all the Covered Trusts
for the relevant time period and, thus, likely possess most, if
not all, relevant, non-duplicative documents. BNYM asserts
Hermann and Cerchio shared "important documents" with their
respective TLs, who are Existing Custodians, and, therefore, the
likelihood that Hermann and Cerchio exclusively possess such

22

documents is minimal. In addition, BNYM argues that Feig's custodial files are likely duplicative of documents located in (1) the files of TLs of the combined 52 Covered Trusts for which Feig was responsible and (2) the files of Lundberg and Facendola. In support of its argument, BNYM points to the fact that each of the exemplar documents that plaintiffs claim are solely possessed by Hermann, Cerchio and Feig are actually duplicates of documents collected from the files of the Existing Custodians.[11] With respect to Ulate, BNYM contends that Exception Reports, to the extent that they exist, would be found in the data collected from Chavez or the shared drives and that any Exception Reports located in Ulate's files would likely be duplicative.

Based on the exemplar documents inadvertently produced by BNYM (see page 14, above), plaintiffs have adequately demonstrated that ESI searches of the custodial files and emails of Hermann and Cerchio "is reasonably calculated to lead to relevant evidence that might not be captured if they were excluded[.]" Fort Worth Employees Ret. Fund v. J.P. Morgan & Chase Co., supra, 297 F.R.D. at 106.

---

[11]Plaintiffs state that over 700 documents in BNYM's inadvertent production exclusively belonged to Ulate, but they have not provided any specific examples.

Based upon the inadvertently produced and publicly available documents, plaintiffs assert that Hermann and Cerchio possess documents and correspondence relating to (1) their efforts to enforce the Sellers' obligations to cure and/or repurchase loans, (2) the Sellers' financial condition and (3) insurers' refusals to pay claims due to BNYM's mismanagement and misrepresentations as trustee of certain Covered Trusts. Such documents would be very important to this case because they relate directly to BNYM's actual knowledge of the Sellers' breaches of contract and whether BNYM exercised appropriate care in the face of such breaches. See Blackrock Allocation Target Shares: Series S Portfolio v. The Bank of N.Y. Mellon, 180 F. Supp. 3d at 258 (holding that plaintiffs will ultimately need to proffer evidence that BNYM had "actual knowledge of breaches and representations and warranties" in order to prevail on the merits).

BNYM argues that such documents would likely be included in the documents collected from the Existing Custodians who are TLs and worked on the same Covered Trusts as Hermann and Cerchio. BNYM's assertion is completely speculative and is, in fact, contrary to its own representations. BNYM has admitted that "TLs and CSMs would not necessarily be copied on or possess all the same documents" (Second Korschun Letter at 6). Accord-

ingly, BNYM cannot say with certainty (or even confidence) that Hermann and Cerchio do not have unique, relevant information. See In re Morgan Stanley Mortg. Pass-Through Certificates Litig., supra, 2013 WL 4838796 at *1.[12] Thus, plaintiffs have sufficiently demonstrated that the additional production is warranted, given that plaintiffs have identified deficiencies in BNYM's production and have "adequately link[ed] [the] deficienc[ies] with the failure to search the files" of Hermann and Cerchio. Mortgage Resolution Servicing, LLC v. J.P. Morgan Chase Bank, N.A., 15 Civ. 293 (LTS)(JCF), 2017 WL 2305398 at *2 (S.D.N.Y. May 18, 2017) (Francis, M.J.).[13]

BNYM's assertion that the designation of Hermann and Cerchio as custodians would constitute an undue burden is also misguided. BNYM's potential burden with respect to Hermann and

---

[12]In addition, a review of the Trust Team members who are Existing Custodians confirms that BNYM could not locate TLs for certain periods of time for certain Covered Trusts and, for a few Covered Trusts, for the entire relevant time period (see List of Trust Team Members). Instead, BNYM designated a CSM or TA who worked on the relevant Covered Trust. Therefore, even if Hermann and Cerchio had shared a substantial portion of their documents with their supervising TLs, it is possible that BNYM could not identify some of their supervising TLs for a certain period of time and, therefore, BNYM's search protocol would not capture Hermann and Cerchio's documents for that time period.

[13]BNYM appears to contend that plaintiffs must provide examples of documents uniquely possessed by Hermann and Cerchio in order to justify their ESI. However, this would place a burden on plaintiffs that would be impossible to sustain. No party can provide examples of documents it does not have.

Cerchio is minimal.  It has already taken substantial steps by collecting ESI from their files that contained plaintiffs' search terms and has apparently reviewed and produced a portion of these documents.  Moreover, BNYM does not provide any information regarding the incremental cost or burden of expanding discovery to include Hermann and Cerchio as custodians.  Rather, BNYM principally argues that an order directing it to produce Hermann and Cerchio's ESI will open the floodgates to unmanageable discovery obligations.  BNYM raises the concern that plaintiffs will respond to such an order by requesting discovery from the other 43 CSMs or approximately 70 TAs who were assigned to the Covered Trusts during the relevant time period.  However, that request is not before me, and even if it were, it would still have to pass muster under the proportionality standard.

Because there is likely to be some, if not substantial, overlap in the discoverable information possessed by Hermann and Cerchio with the Existing Custodians, BNYM may "utilize proce-dures to eliminate duplicative search output from their produc-tion."  Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co., supra, 297 F.R.D. at 106.

With respect to Feig, plaintiffs rely on limited publicly available information, Feig's title and his role within DAG and inadvertently disclosed documents allegedly possessed

solely by Feig to support his inclusion as a custodian. BNYM contends Feig "would have communicated or been copied on communications with TLs and others assigned to specific trusts regarding DAG-facing issues related to those trusts" (Second Korschun Letter at 9). Thus, BNYM argues that Feig's trust-specific documents would likely be found in the files of the TLs of those Covered Trusts who routed issues to Feig. BNYM also contends that Feig received many of the same communications and documents as Lundberg and Facendola (Second Korschun Letter at 9).

As observed above, plaintiffs "must demonstrate that the additional requested custodians would provide <u>unique</u> relevant information" by "providing . . . evidence that there are unique responsive documents being missed in the current search scheme that would justify the inclusion of additional custodians." <u>Fort Worth Employees Ret. Fund v. J.P. Morgan Chase & Co.</u>, <u>supra</u>, 297 F.R.D. at 107. Plaintiffs have identified approximately 52 Covered Trusts a for which Feig was solely responsible for default- and bankruptcy-related issues. In that position, Feig would have (1) sent Notices of Events of Default -- documents that relate directly to plaintiffs' claim of breach of contract -- to the Certificateholders for whom he would have been the sole contact and (2) maintained internal and external correspondence with Sellers concerning the underlying events of default. The

27

documents which plaintiffs allege are possessed solely by Feig fit squarely within the categories of documents apparently possessed by the Existing Custodians who are TLs and CSMs. Specifically, the TLs and CSMs possessed: (1) DAG Reports for the Covered Trusts under their management, which indicated whether an event of default occurred and (2) correspondence between BNYM and any other party, including Certificateholders, discussing the potential occurrence of an event of default. In addition, even assuming the accuracy of Lundberg's testimony that Feig was responsible for administering and overseeing default- and bankruptcy-related issues for more RMBS trusts than any other MD in DAG, it does not conflict with BNYM's assertion that Lundberg and Facendola likely received or were copied on corre- spondence regarding default- and bankruptcy-related issues involving the Covered Trusts and, thus, possess the same docu- ments as Feig. Plaintiffs are not entitled to Feig's custodial files if they are likely to consist of the same documents already collected from the same or a collateral business unit. I con- clude that plaintiffs have failed to demonstrate that Feig's files will contain relevant documents that will not be found in the files of the Existing Custodians or the shared drive.

Finally, plaintiffs claim that BNYM's production to date does not include Exception Reports for approximately 200

Covered Trusts. According to plaintiffs, if these files are not located in Chavez's ESI, they will likely be found in Ulate's files and emails because Ulate and Chavez had similar positions and responsibilities, and documents that BNYM inadvertently produced indicate that he too received Exception Reports. BNYM contends that Exception Reports, to the extent that they exist, would be found in the documents collected from Chavez or the shared drive. Plaintiffs do not distinguish Ulate from Chavez sufficiently to justify adding Ulate as a custodian. Plaintiffs essentially argue that because (1) Ulate and Chavez were both high-ranking employees in DCG and (2) both received Exception Reports, potentially incomplete documents from Chavez's files will likely be made complete by searching Ulate's files. However, "the fact that a rejected custodian's role was immaterially different than a designated custodian's role is not a legitimate basis to justify expanding the list of custodians." In re Morgan Stanley Mortg. Pass-Through Certificates Litig., supra, 2013 WL 4838796 at *3. Moreover, plaintiffs have "produced nothing more than 'mere speculation that [the allegedly missing Exception Reports] might exist[']", which is insufficient to justify compelling the searches and productions requested. Assured Guar. Mun. Corp. v. UBS Real Estate Secs. Inc., 12 Civ. 1579 (HB)(JCF), 12 Civ. 7322 (HB)(JCF), 2013 WL 1195545 at *5, quoting Garcia v.

*Tyson Foods, Inc.*, Civ. A. No. 06-2198, 2010 WL 5392660 at *14
(D. Kan. Dec. 21, 2010) (emphasis omitted).

In concluding that plaintiffs have failed to demon-
strate that either Feig or Ulate possessed <u>unique</u>, relevant
documents, I recognize the importance of the documents sought
from these individuals' files. Specifically, one theory of
plaintiffs' breach of contract claim is that BNYM had "actual
knowledge" that events of default occurred, but failed to "act as
a prudent person" would, constituting a breach of the Governing
Agreements. <u>Blackrock Allocation Target Shares:  Series S
Portfolio v. The Bank of N.Y. Mellon</u>, <u>supra</u>, 180 F. Supp. 3d at
259-60.  Because plaintiffs must eventually prove that BNYM had
"actual knowledge" of the events of default on a trust-specific
basis, Notices of Events of Default and other communications to
Certificateholders about the occurrence of events of default may
be critical to plaintiffs' claims.  In addition, Exception
Reports, according to plaintiffs, memorialize when and how BNYM
learned of the Sellers' breaches of warranties and representa-
tions of loans collateralizing the Covered Trusts.  These docu-
ments, of which plaintiffs claim Ulate possesses at least a
subset, would serve as compelling evidence of "specific breaches
of representations or [actual] knowledge of breaches regarding
specific mortgage loans," as is required to prove breach of

contract against an RMBS trustee.  <u>Blackrock Allocation Target</u>
<u>Shares:  Series S Portfolio v. The Bank of N.Y. Mellon</u>, 180 F.
Supp. 3d at 258, <u>citing</u> <u>Retirement Bd. Of the Policemen's Annuity</u>
<u>& Benefit Fund of the City of Chi. v. The Bank of N.Y. Mellon</u>,
775 F.3d 154, 162 (2d Cir. 2014).  However, I also recognize that
plaintiffs' inability to meet its burden with respect to Feig and
Ulate is, in part, due to the fact that plaintiffs' request is
premature.  BNYM is involved in an ongoing, rolling production.
Plaintiffs have not received or reviewed the universe of ESI that
BNYM is producing, and, thus, plaintiffs are forced to take BNYM
at its word that Feig and Ulate's documents will ultimately
constitute merely a subset of the entire production.  Nonethe-
less, the concept of proportionality teaches that plaintiffs are
not entitled to every single document, especially documents which
have been or will be produced and which, therefore, have no
"marginal utility".  <u>Royal Park Investments SA/NV v. Deutsche</u>
<u>Bank Nat'l Trust Co.</u>, 14 Civ. 4394 (AJN)(BCM), 2018 WL 1088020 at
*2 (S.D.N.Y. Feb. 12, 2018) (Moses, M.J.) (holding that discovery
of documents that would merely "add further circumstantial
evidence to the critical weight of evidence" conferred low
marginal utility to plaintiffs).

However, if plaintiffs can demonstrate a particularized
need for discovery from Feig and Ulate after all parties have a

better understanding of the universe of documents being collected and produced, I might reconsider the application to search the files of Feig and Ulate after the parties have complied with their meet-and-confer obligations pursuant to Federal Rule of Civil Procedure 37(a)(1). See Eisai Inc. v. Sanofi-Aventis U.S., LLC, Civ. A. No. 08-4168, 2012 WL 1299379 at *9 (D.N.J. Apr. 16, 2012).

### 2. Proposed Custodians: Fudali, Tadie, Peetz, Posner & Kamback

Plaintiffs cite Fudali, Tadie, Peetz, Posner and Kamback's senior positions within CT and their membership on certain CT committees responsible for risk-management with respect to RMBS trusts to argue that they exclusively possess relevant information. BNYM contends that these five Proposed Custodians do not possess any trust-specific documents and rely on Retirement Bd. of the Policemen's Annuity & Benefit Fund of the City of Chi. v. The Bank of N.Y. Mellon, supra, 775 F.3d at 162 ("Retirement Board"), to argue that this ESI is not sufficiently relevant to warrant searching their custodial files.

In Retirement Board, the Second Circuit held, in determining class standing, that a plaintiff asserting claims identical to those brought here could not rely on "generalized

proof" to demonstrate trustee liability for breach of contract.
The Second Circuit stated, in pertinent part,

> [W]hether Countrywide breached its obligations under
> the governing agreements (thus triggering BNYM's duty
> to act) requires examining its conduct with respect to
> each trust. Whether it was obligated to repurchase a
> given loan requires examining which loans, in which
> trusts, were in breach of the representations and
> warranties. And whether a loan's documentation was
> deficient requires looking at individual loans and
> documents.

Following the Second Circuit's decision in <u>Retirement Board</u>,
judges in this District have concluded that, "although <u>Retirement</u>
<u>Board</u> arose in the context of determining class standing, the
Second Circuit nevertheless made clear that to prevail on the
merits of their RMBS claims, [] plaintiffs cannot rely on gener-
alized proof"; rather, plaintiffs must prove their claims against
the trustee, "loan-by-loan and trust-by-trust." <u>Phoenix Light SF</u>
<u>Ltd. v. The Bank of N.Y. Mellon</u>, 14 Civ. 10104 (VEC), 2017 WL
3973951 at *8 (S.D.N.Y. Sept. 7, 2017) (Caproni, D.J.) (rejecting
plaintiff's summary judgment motion due to "lack of loan- or
trust-specific proof relative to BNYM's knowledge of any breach),
citing <u>Royal Park Investments SA/NV v. HSBC Bank USA Nat'l Ass'n</u>,
14 Civ. 8175 (LGS)(SN), 14 Civ. 9366 (LGS)(SN), 14 Civ. 10101
(LGS)(SN), 15 Civ. 2144 (LGS)(SN), 15 Civ. 10032 (LGS)(SN), 15
Civ. 10096 (LGS)(SN), 2017 WL 945099 (S.D.N.Y. Mar. 10, 2017)
(Netburn, M.J.) (rejecting plaintiffs' "pervasive breach theory"

(collecting cases)); see <u>Royal Park Investments SA/NV v. Deutsche</u>
<u>Bank Nat'l Trust Co.</u>, <u>supra</u>, 2018 WL 1088020 at *2 ("RMBS inves-
tor meets its pleading burden by showing that the trustee was
generally aware of systemic [] breaches (including breaches in
other RMBS trusts), but must ultimately prove, on a loan-by-loan
basis, that the trustee had actual knowledge of the specific non-
conforming loans . . . .").

　　　　Plaintiffs argue that just as the Second Circuit's
standard stated in <u>Retirement Board</u> "is not valid in the proce-
dural posture of a motion to dismiss," <u>Royal Park Investments</u>
<u>SA/NV v. The Bank of N.Y. Mellon</u>, 14 Civ. 6502 (GHW), 2016 WL
899320 at *4 (S.D.N.Y. Mar. 2, 2016) (Woods, D.J.), the <u>Retire-</u>
<u>ment Board</u> standard is similarly inapposite in determining the
threshold issue of relevance in a discovery dispute. See <u>Phoenix</u>
<u>Light SF Limited v. The Bank of N.Y. Mellon</u>, <u>supra</u>, 2017 WL
3973951 at *6 (holding that applying <u>Retirement Board</u> standard in
the pleadings context was improper); see <u>Blackrock Allocation</u>
<u>Target Shares: Series S Portfolio v. The Bank of N.Y. Mellon</u>,
<u>supra</u>, 180 F. Supp. 3d at 258 ("The language on which BNYM
relies, however, 'looks way down the road from [the pleadings
stage] to the proof that Plaintiffs would need to proffer to
prevail on the merits -- not the level of proof necessary to
raise a reasonable inference that Defendant is liable.'"),

quoting Phoenix Light SF Limited v. The Bank of N.Y. Mellon, supra, 2017 WL 3973951 at *6. Application of that standard, according to plaintiffs, would lead to an unduly restrictive construction of "relevancy".

Plaintiffs' argument is unavailing. As observed above, "relevance", for purposes of discovery, is a "broad concept" that does not limit discovery to only those documents that can establish plaintiffs' ultimate burden of proof. Vaigasi v. Solow Mgmt. Corp., supra, 2016 WL 616386 at *11. However, the boundaries of relevance in any particular action are necessarily shaped by the claims and defenses asserted therein. See Catlin Syndicate 2003 v. Traditional Air Conditioning, Inc., 17-CV-2406 (JFB)(AYS), 2018 WL 1459483 at *5 (E.D.N.Y. Mar. 23, 2018) ("[R]elevance continues to be a broad concept, applying to matters that bears claims and defenses[.]" (internal quotations omitted)); see also D.H. v. City of New York, 16 Civ. 7698 (PKC)(KNF), 2017 WL 6887792 at *2 (S.D.N.Y. Nov. 28, 2017) (Fox, M.J.); Gilani v. Hewlett Packard Co., supra, 2017 WL 4236564 at *1 (holding that relevant information includes any information that "'reasonably could lead to other matter that could bear on any issue that is or may be in the case.[']"), quoting Oppenheimer Fund, Inc. v. Sanders, supra, 437 U.S. at 357.

35

As explained above, <u>Retirement Board</u> and its progeny teach precisely what a plaintiff must prove in a breach of contract action against the trustee of RMBS trusts; a plaintiff must ultimately prove that the trustee had "actual knowledge" of the Sellers' breaches of representations and warranties "loan-by-loan" and events of default "trust-by-trust" in order to ultimately establish the trustee's liability.  Thus, <u>Retirement Board</u> and its progeny are instructive in defining the universe of discoverable information in this action.  <u>Retirement Board</u> also bears directly on the application of the proportionality standard by distinguishing important documents -- documents that are loan- and trust-specific -- from those that are of considerable less importance -- documents that merely establish general knowledge of trustee misconduct.

"While no special exemptions from discovery exist for senior executives who possess relevant information, . . ., mere membership on a particular committee is not sufficient, by itself, to justify designation as a custodian whose files must be reviewed." <u>Assured Guar. Mun. Corp. v. UBS Real Estate Secs. Inc.</u>, <u>supra</u>, 2013 WL 1195545 at *3, <u>citing</u>, <u>inter alia</u>, <u>United States ex rel. McBride v. Halliburton Co.</u>, 272 F.R.D. 235, 240-41 (D.D.C. 2011).  Rather, the court is obligated to consider, among other things, whether the discovery sought is of sufficient

importance to justify the burden and cost that discovery will impose on the responding party.  See Assured Guar. Mun. Corp. v. UBS Real Estate Secs. Inc., supra, 2013 WL 1195545 at *3, citing United States ex rel. McBride v. Halliburton Co., supra, 272 F.R.D. at 240-41 (denying plaintiff's motion to compel production from additional custodians on the ground that plaintiff failed to demonstrate that proposed custodians' emails were crucial to her ultimate burden of proof) and Eisai Inc. v. Sanofi-Aventis U.S., LLC, supra, 2012 WL 1299379 at *9 (denying motion to compel 27 additional custodians and accepting defendants' rationale for selecting 32 custodians to respond fully to plaintiffs' documents requests and produce responsive, non-duplicative documents over the relevant time period).

Although plaintiffs have demonstrated that Fudali, Tadie, Peetz, Posner and Kamback probably possess relevant documents pertaining to BNYM's "general knowledge" about risks posed by Sellers and Servicers to the Covered Trusts that other custodians will not have by virtue of their seniority and their roles on certain committees, plaintiffs have failed to establish the marginal utility of searching their files.  BNYM maintains, and plaintiffs do not dispute, that these Proposed Custodians did not work on any Covered Trusts in particular, and, thus, probably do not possess trust- or loan-specific documents.  Rather,

plaintiffs maintain that these Proposed Custodians were "key decision-makers" who managed CT's exposure and risk in its obligations as trustee. As explained above, the marginal utility of discovery of documents relating to BNYM's "general knowledge" of misconduct is low, in part because the benefit of such circumstantial evidence is minimal where BNYM has produced or is producing Covered Trust-specific documents that plaintiffs ultimately will need to use to meet its burden in establishing trustee liability. See Royal Park Investments SA/NV v. Deutsche Bank Nat'l Trust Co., supra, 2018 WL 1088020 at *8 (holding that discovery of documents that would merely "add further evidence to the critical weight of evidence" provided low marginal utility to plaintiffs).

Accordingly, plaintiffs' request to designate Fudali, Tadie, Peetz, Posner and Kamback as custodians is denied without prejudice for renewal. As stated on pages 30-32, as the litigation progresses and the parties' come to better understand the universe of documents collected from the Existing Custodians and Shared Space, I might consider plaintiff's request for additional discovery from Fudali, Tadie, Peetz, Posner and Kamback if plaintiffs can demonstrate a particularized need for discovery from those Proposed Custodians. However, the parties must comply

with their meet-and-confer obligations pursuant to Federal Rule of Civil Procedure 37(a)(1) before making any such request.

IV. Conclusion

For the reasons set forth above, plaintiffs' request is granted to the extent that they seek to add Hermann and Cerchio as custodians. Plaintiffs' request is denied, without prejudice, to the extent that they seek to add Feig, Ulate, Fudali, Tadie, Peetz, Posner and Kamback as custodians.

Dated: New York, New York
May 14, 2018

SO ORDERED

_____
HENRY PITMAN
United States Magistrate Judge

Copies transmitted to:

All Counsel of Record